IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

              Respondent,

    v.

D.L.W., a juvenile,

              Appellant.

No. 85261-2-I

DIVISION ONE

UNPUBLISHED OPINION

COBURN, J. — D.L.W., a juvenile who was found to have escaped from home custody after a bench trial, appeals on the basis his due process right to a fair trial was denied by the actions of the trial judge. The court repeatedly responded to defense objections by eliciting testimony from multiple State witnesses that laid the foundation it then relied on to admit the State's evidence, and it often did so *sua sponte* before asking the State to respond to the objection or asking if it wished to conduct redirect. We recognize that judges presiding in bench trials are tasked with the "unique demands" of sitting "as both arbiters of law and as finders of fact." State v. Read, 147 Wn.2d 238, 245, 53 P.3d 26 (2002). However, a judge "should not enter into the 'fray of combat' or assume the role of counsel." State v. Ra, 144 Wn. App. 688, 705, 175 P.3d 609 (2008) (quoting Egede-Nissen v. Crystal Mountain, Inc., 93 Wn.2d 127, 141, 606 P.2d 1214 (1980)). The cumulative effect of the court's interjections constitutes a manifest constitutional error requiring reversal and remand before a different judge.

FACTS

In June 2022, the State charged then 15-year-old D.L.W. with escape in the second degree in juvenile court in King County.  RCW 9A.76.120(1)(b).  The State alleged that D.L.W.,

> [i]n King County, Washington, on or about May 1, 2022, after having been charged with the felony of Assault in the First Degree and Unlawful Possession of a Firearm in the Second Degree, did knowingly escape from the custody of Department of Adult and Juvenile Detention, Alternatives to Secure Detention, knowing that his actions would result in leaving custody without permission.

To prove its case, the State called four witnesses to establish that D.L.W. knowingly left custody without permission by cutting off his electronic home monitoring (EHM) ankle bracelet.  During the bench trial, the State called community custody placement and corrections officers Sean Spencer, Fred Graves, Talia Carter, and Pamela Dunkley.  The defense did not call any witnesses.

*A.  Sean Spencer*

The State first called Spencer, a community placement specialist, to testify generally as to EHM contracts and the ankle monitor technology.  Spencer testified that they go over the contract with the juvenile and usually a parent, and that "we usually tell them that just because you're at home, you're still in detention.  So it's home detention."  Spencer testified that he usually summarizes the contract and does not read it step by step because "that would take forever."  As to D.L.W. specifically, Spencer testified that he was the one who placed D.L.W. on EHM during an earlier stint on EHM that began in September 2021.  When the State asked if he could recall conversations he had with D.L.W. about being out of the monitoring range while on EHM or any other issue, Spencer testified that he "believe[s] so" but could not be specific.  During direct

2

examination, Spencer said he specifically recalled going over what would happen if D.L.W. cut off the monitor. Spencer explained that he goes over the escaping acknowledgment: "he cut the bracelet off. You know, you're on escape four here. In another place with the bracelet on but you're missing for a certain amount of time, and you're not supposed to be (indecipherable), you will be placed on escape status."

On cross examination, Spencer was asked if he actually remembered interacting with D.L.W. while going over the contract or whether he was basing his answers off of what he had read in reports. Spencer replied that he *felt* like he saw D.L.W. and went over the contract "at least twice that day," but that "I cannot say for sure." Spencer also could not say for certain that he interviewed D.L.W. while he was in detention. Spencer also testified that he could not remember which parent was with D.L.W. during the signing of the contract for the September EHM and if that parent had any questions or if D.L.W. had any questions.

Spencer said he did not have a copy of the September contract in front of him and the State explained to the court it did not have that contract. Spencer conceded to the court that he could not say that he had a specific recall of going over the EHM contract with D.L.W. or of him signing it. The court then asked the witness several more questions.

> THE COURT: How do you recognize [D.L.W.].
> THE WITNESS: I know [D.L.W.] from working with him over the last year and a half.
> THE COURT: Okay. But back in September of 2021, did you put the actual ankle monitor or bracelet on him?
> THE WITNESS: I didn't. The CSO probably did. But I was there when it happened. And we signed the contract that day.
> THE COURT: Okay. Do you recall specifically that you spoke to [D.L.W.] and told him what would happen if he cut off the bracelet.
> THE WITNESS: I did.

3

THE COURT:  This you do have specific recall.
THE WITNESS:  Yes, Your Honor.
THE COURT:  And what did you tell him at that time would happen to him if he cut off his bracelet.
THE WITNESS:  That he could be looking at another felony . . . . I didn't say it would happen.  That he may be looking at another felony.

Spencer also clarified that the reports that he had reviewed prior to testifying were reports by officer Carter.  The defense moved to strike Spencer's testimony because he did not have an independent recollection of a meeting with D.L.W. and because he relied on hearsay.

The court struck testimony that relied on Carter's report, but denied striking all of the testimony, explaining, "I understand he does not have specific recall of a lot of things.  He did say, however, that he does specifically recall telling this respondent in the period in September 2021 what would happen if he cut off his ankle bracelet."

*B. Fred Graves*

The State next called Graves, a corrections sergeant with King County Jail. Graves testified that he reviews paperwork that the juvenile division sends when people violate the conditions of their EHM, which is what he did in D.L.W.'s current case.  After the State struggled on direct examination, the court asked the prosecutor, "[W]hat are you trying to elicit from this witness?"  When the prosecutor explained that she was simply trying to establish the element that the crime occurred in the state of Washington, the court said "[L]et me voir dire the witness."  The following exchange ensued:

THE COURT:  In terms of your duties as a corrections Sergeant with King County Jail, what's your role, if any, if and when someone absconds while on electric home monitoring?
THE WITNESS:  What are our duties for that part, sir?
THE COURT:  Yeah.

4

THE WITNESS:  We get the reports forwarded to us.  We review them along with court documents.

THE COURT:  And what's the purpose of getting all that information?

THE WITNESS:  To come to the conclusion whether it rises to the level of what we filed as the charges.

THE COURT:  Okay.  And in terms of making those decisions, what's the geographic jurisdictional boundaries.

THE WITNESS:  The fact that they were in our legal custody at the time.

THE COURT:  Okay.

THE WITNESS:  When the violation occurred, we operate under that as they absconded from our custody and we –

THE COURT:  Okay.  So in other words, if someone was on the EHM in Snohomish County and they absconded, that's not going to be necessarily within your purview to act; correct?

THE WITNESS:  No, sir.

THE COURT:  So because you're a corrections Sergeant with the King County Jail, then you deal with people who abscond or likes to have abscond while in King County while being monitored in King County; is that correct?

THE WITNESS:  Correct.

THE COURT:  Okay.  What happens if they are placed on EHM by this court, for example, but it's EHM being monitored while they are residing in another county.  Does that happen?

THE WITNESS:  It has.  And we still – we file the charges.

THE COURT:  Okay.  All right.  [State], you may proceed.

[STATE]:  Thank you, Your Honor.  And, Your Honor, at this time I don't have any additional questions for this witness.

*C.  Talia Carter*

The State next called Carter, a community surveillance officer who testified about the EHM monitoring alert system and documents that are produced during alerts.  The State attempted to admit Exhibit 2, the activity summary for D.L.W. while he was on EHM, as a business record.  This included information that D.L.W. had a pass, while on EHM, to take his dog on a daily walk from 7:15 to 7:30 a.m. within his apartment complex.  Defense objected for lack of foundation.  The court agreed that foundation had not been established and permitted defense to voir dire the witness.  After defense

was done with voir dire and asked to be heard regarding the State's motion to admit, the court said, "Let me voir dire the witness." The following exchange took place:

> THE COURT: – you indicated that these reports are generated every day; is that correct.
> THE WITNESS: Yes.
> THE COURT: Generated by whom?
> THE WITNESS: The CSO that started that shift. Or is on duty at that moment.
> THE COURT: So that particular exhibit you did not generate; correct?
> THE WITNESS: Yes.
> THE COURT: Or you did?
> THE WITNESS: This one in particular, yes.
> THE COURT: Okay. And it contains information about alerts?
> THE WITNESS: Yes.
> THE COURT: And the information regarding alerts, you get from a different source; correct?
> THE WITNESS: The information that I got from his tracker and (indecipherable) yes.
> THE COURT: Okay. And what is – what's the source of that information?
> THE WITNESS: Which? Of his tracker?
> THE COURT: Mm-hmm.
> THE WITNESS: It goes through the app. So – sorry – excuse me. I can request the information. I can see where he's at in – I guess life moments, if –
> THE COURT: So you're accessing internal, for example.
> THE WITNESS: If [sic] go into BI,[1] and I hit his profile, say, for instance, and then I can see exactly where he's at at that moment and time. And then I can pull up anything from a specific time frame that I may want to look at.
> THE COURT: Okay. So obviously, as the responsible party, you're aware of the conditions and parameters that have been put in place.
> THE WITNESS: For him, yes.
> THE COURT: Okay. And then based on those conditions and parameters you daily check the BI system to see if he's in compliance or out of compliance –
> THE WITNESS: Yes.
> THE COURT: – is that correct? And you do this on a daily basis?
> THE WITNESS: Yes.
> THE COURT: Okay. Now, you don't compile the alert information yourself, do you?

---

[1] "BI" is the system that collects the data from the ankle bracelet and generates reports monitored by community detention officers.

THE WITNESS: BI does.

THE COURT: Okay. But as an officer, you rely on this information on a regular basis –

THE WITNESS: Yes.

THE COURT: – is that correct? Have you ever found it to be unreliable information where it's been wrong or mistaken?

THE WITNESS: Not to my knowledge. As me personally, no.

THE COURT: Okay. And how long have you been working in this capacity where you check daily the information from BI?

THE WITNESS: Ten years.

THE COURT: Okay. And so every day, how often – how many times do you check this database?

THE WITNESS: All the time.

THE COURT: Okay. Do you have any reason to believe that the information is not reliable or accurate?

THE WITNESS: No.

THE COURT: Okay. And you, yourself, have never encountered any problems or in accuracies with the information or the data?

THE WITNESS: Me, myself, no.

THE COURT: Okay. And then you generate a report based on what you obtain; is that correct?

THE WITNESS: Yes.

THE COURT: And that's the report that you have in front of you?

THE WITNESS: Yes.

The court then turned to the parties for further argument and the State maintained that

the testimony established the foundation for a business record exception. Instead of

making a ruling, the court again asked a series of questions to the witness:

THE COURT: With respect to the information that you're accessing for the BI portal or the website, is that information being updated all the time?

THE WITNESS: Yes.

THE COURT: Okay. And are you looking at it realtime [sic]?

THE WITNESS: Yes.

THE COURT: Okay. And in this particular case, when you prepared that report based on the BI information that you were looking at, did you actually then follow up to try to reach out to the respondent, for example.

THE WITNESS: Yes.

THE COURT: And is that something you do just to confirm that the information is correct?

THE WITNESS: Yes.

THE COURT: And did you do that in this particular case?

THE WITNESS: Yes.

THE COURT: And were you able to confirm that the information you were seeing on the BI portal was consistent with what it was that you derived once you reached out and tried to contact the respondent or his parent?

THE WITNESS: Yes.

THE COURT: I'm satisfied that there's sufficient indicia of reliability under RCW 5.45.020, which is the business records as evidence.

For the record, it provides a record of an act, condition, or event showing so far as relevant be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation and if it was made in the regular course of business at or near the time of the act, condition, or event; and if any opinion of the court resources of information, method and time of preparation were such as to justify its admission.

And as I stated, I find this sufficient indicia of reliability to allow its admission. So State's Exhibit No. 2 will be admitted.

Carter later testified that she noticed D.L.W. was within the time frame of his dog-walking pass, but that Carter did not get a report that D.L.W. had returned at 7:30 and there was an alert for "a strap tamper and proximity tamper, which indicates that the tracker strap itself had been cut." Defense objected asking the court to "strike the last sentence as far as what the alert actually indicated." Instead of making a ruling or asking the State to respond, the court asked the witness the following series of questions before overruling the objection:

THE COURT: Ms. Carter, based on your training and experience, are there several possibilities with respect to what it can mean if there's a strap tamper or proximity tamper alert?

THE WITNESS: No.

THE COURT: How many explanations or scenarios could there be if you get such alerts?

THE WITNESS: There's only one.

THE COURT: And what's that?

THE WITNESS: That it was cut.

THE COURT: Okay. Let me ask what might sound like a stupid question. Based on the names of these alleged proximity tamper alert, to my me as a layperson it would suggest maybe you've gone too far or you've gone outside the boundaries.

Whereas a strap tamper alert, just in the plain language suggests maybe someone is fidgeting with their strap and not necessarily having cut it. Would – would, for example – so why would the only explanation be that someone had cut off their bracelet based on those tamper alerts that you received.

THE WITNESS: A strap tamper comes from the strap actually being cut, because it – the wires and the – with the GPS system in the strap has to have that strong interference.

So if you just mess with the strap, like rub on it, it's not enough to cause that. You have to actually break the signal.

THE COURT: Okay.

THE WITNESS: And the strap for it to revert to the inner strap –

THE COURT: Have you –

THE WITNESS: – tamper alert.

THE COURT: – ever experienced where you've seen a strap tamper alert and then there's been nothing wrong with the ankle bracelet?

THE WITNESS: No.

THE COURT: And what about a strap tamper alert together with a proximity alert, what does that mean?

THE WITNESS: The strap tamper means that it was cut. And then the proximity tamper means that it was taken away from the tracker itself.

So the strap was cut and then it's – it's not getting that signal that it needs to be like this – or together, for the lack of a better word.

THE COURT: Just like a circuit that's been broken?

THE WITNESS: Yeah.

THE COURT: Okay. And then based on receiving those alerts, you then are instructed or trained to do a follow-up to –

THE WITNESS: Yes.

THE COURT: Okay. And did you do that had –

THE WITNESS: Yes.

THE COURT: – in this particular case? The objection is overruled.

Later the State tried to elicit from Carter what D.L.W.'s father had told her when Carter called the father after D.L.W. had not responded to attempts to phone him after the alerts. Carter testified that she communicated to the father that the tracker had been cut, that D.L.W. was not responding to telephone attempts to reach him, and that they needed the father to verify. Defense made a hearsay objection. The State argued that what the father relayed to Carter qualified as present sense impression, an exception to hearsay. The court agreed with the State but explained, "there's some

9

foundation questions that you need to ask to establish that this was indeed the father relaying information as he perceived the particular event or condition or immediately thereafter."  The State attempted to do so and then argued that it believed it had laid the proper foundation.  The court did not rule on admissibility at this time or ask to hear from defense.  Instead, it asked the witness the following questions before ruling that it would allow the testimony as present sense impression:

> THE COURT: Ms. Carter, you said that a person identifying himself as [D.L.W.'s father] called you back?
> THE WITNESS: Yes.
> THE COURT: How long after you had left the message?
> THE WITNESS: He called back I would say maybe roughly an hour later.
> THE COURT: Okay. And did he ask for you by name?
> THE WITNESS: He just – we have a – a main – a main phone number that any of the CSOs can answer. I just answered it.
> THE COURT: Right. And when you answer, you heard his voice?
> THE WITNESS: Yes.
> THE COURT: And did he ask for you by name as if he was returning a message or was he asking just general information, for example?
> THE WITNESS: He was just asking for – he was asking for whoever answered the phone, if that makes sense.
> THE COURT: And could you tell – well, then you had a conversation with him; correct?
> THE WITNESS: Yes.
> THE COURT: And you told him to go to a specific location –
> THE WITNESS: Yes.
> THE COURT: – to see if he could find his son?
> THE WITNESS: Yes.
> THE COURT: Okay. And – how far was that location from the father, could you tell?
> THE WITNESS: From his apartment complex it was in the front of the whole entire complex.
> So like, his building is in the back of the complex. And this was in the front on the sidewalk area in the bushes area.
> THE COURT: And while you were speaking to this individual, did he seem to indicate he understood what you were talking about and geographically where you wanted him to go?
> THE WITNESS: Yes. I was able to tell him that.

THE COURT: Okay. And you were on the phone with him the whole time?
THE WITNESS: Yes.
THE COURT: Okay. And did he indicate to you he arrived at the location you wanted him to go?
THE WITNESS: Yes.
THE COURT: And did he immediately tell you what he saw?
THE WITNESS: Yes.
THE COURT: Which was?
THE WITNESS: That he found the tracker.
THE COURT: I'm going to allow it as a present sense impression.

*D. Pamela Dunkley*

The final witness the State called was Dunkley, a community surveillance officer. She testified that in December 2021 she was on a special assignment as a community placement specialist. It was in that role that Dunkley met with youths and their parent or guardian they were going to be placed with to go over the EHM contract. Similar to Spencer, Dunkley testified that she usually did not read the contract, but summarized it because the contract is long. The State attempted to introduce Exhibit 6, D.L.W.'s December EHM contract. Defense first objected to Dunkley testifying that the contract was signed by a youth signature and a parent signature for lack of foundation. The court did not ask for the State's response before immediately questioning the witness directly as follows:

THE COURT: [D]id you witness the signing?
THE WITNESS: I signed the contract.
THE COURT: Okay.
THE WITNESS: As well as the youth and the parent or guardian –
THE COURT: Right.
THE WITNESS: – That's on here.
THE COURT: Were you present when the contract was signed.
THE WITNESS: I don't remember this placement. But since I signed it, I would have been there.
THE COURT: Okay. If – if the contract is not signed in your presence, do you normally sign off on a contract?
THE WITNESS: No, I wouldn't sign if I'm not there.

11

THE COURT: And is it your usual practice to witness the signatures even though you don't have a specific recollection of this particular incident?

THE WITNESS: Yeah, I would have to have been there with them. If I signed it, they would have to sign it while I'm there.

. . .

THE COURT: And what if someone came to you with the paperwork already signed and you never –

THE WITNESS: No.

THE COURT: – witnessed it.

THE WITNESS: Because they only – they sign it that moment.

THE COURT: Okay. In your presence?

THE WITNESS: Yeah. It would have to be signed at that moment while I was there.

THE COURT: And is that the official protocol?

THE WITNESS: Yes.

THE COURT: And do you follow the official protocol?

THE WITNESS: Yes.

THE COURT: Have you ever deviated from the official protocol?

THE WITNESS: No.

THE COURT: Okay. I'm going to allow the testimony.

The State moved to admit Exhibit 6 after confirming that the contract was for D.L.W.

Defense objected again for lack of foundation. The court responded:

THE COURT: I believe she testified when I asked her, um, voir dire questions that while she doesn't have any specific recall of this, which is not necessarily surprising given the passage of time. Her signature does appear on that contract. It's the normal official protocol to sign it in the presence of both one or both parents and the youth.

There – under the section for the youth's name and the parent name, apparently there are signatures. Again, which she does not have specific recall as to witnessing them being signed, but that's the official protocol. She would not have signed it unless they had signed it in her presence. She would not have signed it if another officer had – went over or gone over the contract with the individuals, nor would she have signed it if the order had been presented to her already signed by individuals. She said she's also never deviated from that official protocol.

The court then asked the witness a few more questions:

THE COURT: Officer, is there any reason for you to have any concerns about the authenticity of that particular document?

THE WITNESS: No.

> THE COURT: And you're certain it is – for example, your signature that appears on that.
>
> THE WITNESS: This is my signature.

The court admitted the exhibit as a business record explaining, "I'm satisfied that based on the officer's testimony, this was made in the regular course of business pursuant to official protocol at or near the time of the actual signing of the contract and I believe under the circumstances based on the testimony, that it is sufficiently reliable to justify admission." During cross examination, Dunkley testified that she did not specifically remember "at all" the placement and signing of this particular contract with D.L.W. and could not say whether he had any questions or not. She also reiterated that she did not read the contract word for word and, instead, summarizes the information in the contract. After defense was done with cross examination, the court immediately followed with several questions for the witness.

> THE COURT: Officer, I think you testified earlier during direct exam that you don't actually read the entire contract to a person; is that correct.
>
> THE WITNESS: No, we don't read verbatim.
>
> THE COURT: And you said it's because it might take too long.
>
> THE WITNESS: Take too long and also they might not – they might understand what you're reading. So that's why we just – we kind of, um, summarize it in a way. I don't say understand, but – not pay attention, I guess.
>
> THE COURT: All right.
>
> THE WITNESS: They just – we just don't read the whole thing. It's three pages long.
>
> THE COURT: So what do you highlight?
>
> THE WITNESS: We highlight –
>
> THE COURT: You personally.
>
> THE WITNESS: The address.
>
> THE COURT: Okay.
>
> THE WITNESS: Go over the address. We go over curfews. We go over the equipment itself. The cost of the equipment.
>
> THE COURT: Why do you do that?
>
> THE WITNESS: How do we do that?
>
> THE COURT: Why do you do that?

THE WITNESS: Oh, um, just so they understand about the equipment and how – also how the equipment works and that the cost of the equipment. If anything is to happen to it, that they are responsible for the equipment.

THE COURT: Okay.

THE WITNESS: Because they believe that they get charged for the equipment. Because we do do a – I can't remember what we – we do. Um, when – if we don't get the equipment back or if they lose it or whatever. It's – that's also in the contract. So we make sure we go over that as well.

THE COURT: Okay. And what else?

THE WITNESS: We go over going out of ranges. Or if they don't have a curfew and they leave without a curfew. We always try to highlight about being on a curfew.

THE COURT: Why is that important?

THE WITNESS: So they know they can't just leave.

THE COURT: Why is that important?

THE WITNESS: Because they could be brought into detention, if they just leave without having a curfew.

THE COURT: All right. What else?

THE WITNESS: Um, I'm sorry, I'm trying to remember.

Um... that they have to reside at the residence – at the address that was given. So – so we always try to make sure we go over the address with them. They can't leave and go somewhere else to stay without notifying us or a probation officer.

THE COURT: And again, what would happen if that – you would explain what would happen if they did that?

THE WITNESS: Yeah. It could be an escape, because we don't know where they are. Because we're going according to what the address they give us, and that's what we have in the system.

THE COURT: Okay.

THE WITNESS: That's the address they should be residing at.

THE COURT: Do you explain how the ankle bracelet works in terms of how it keeps track of people and how it monitors people?

THE WITNESS: The way I would explain it – I always explain it, like it's a GPS. So all I have to do is I can see and we can tell that you're leaving.

So that's why we always explain about the curfew, is that you leave your house we can tell. Because it's a GPS, just like your phone. You can put a GPS in and it will show you where you are.

THE COURT: Do you also specifically advise what might happen if they were to tamper or cut the bracelet.

THE WITNESS: Yeah. We explain that – um, that's where the escape acknowledgement comes in. If they cut off the anklet, they would be placed on escape status and a warrant would be issued.

THE COURT: Okay. Is that something you focus on?

THE WITNESS: Yes, because the escape acknowledgement is on the back.

THE COURT: Okay.

THE WITNESS: So we always had to explain how that works.

THE COURT: All right. And, again, while you don't have any specific recollection with respect to your conversations with the respondent, is this something you always do?

THE WITNESS: I did, yes. That's one thing that you make sure to explain.

THE COURT: To the best of your knowledge, have you ever deviated from that protocol you just described.

THE WITNESS: No.

THE COURT: Okay. Do you have any recollection whether the respondent demonstrated any confusion or anything remarkable and notable about your exchange or interaction with him?

THE WITNESS: No.

THE COURT: If there had been something unusual or remarkable, would you have noted it somewhere?

THE WITNESS: I – I believe we usually do in the notes. Yeah.

THE COURT: Okay. And if you felt through your interaction that someone – whether it's a parent or the respondent did not understand any of the instructions, what would you do?

THE WITNESS: If they don't understand, usually – the parents will usually – from what I've experienced before, they would always ask the questions if they don't understand. And they'll just be asking the questions until we're able to explain to them how everything works.

THE COURT: Do you ever let any [parties] sign the contract if they do not fully understand everything?

THE WITNESS: I didn't do that, no.

THE COURT: So again, is there anything at all about your memory of your interactions with the respondent that would give you pause for any reason about whether you follow protocol, whether he understood everything, whether the parents understood everything? Anything at all that comes to mind?

THE WITNESS: No.

The court then asked the State if it had any follow-up questions. The State replied, "No, Your Honor, you covered a couple of them that I had on redirect. So nothing further from the State." When the court turned to defense, counsel said, "I did just want to put on the record a formal objection to the Court asking the questions specifically. So I would object to that – those questions and the testimony for the record, otherwise I don't

have any additional questions no." The court noted the objection and, after confirming that the State and defense had no other witnesses, proceeded to closing arguments. In closing, the State argued that these witnesses and the contract D.L.W. signed establishes that he knew about the EHM conditions, and that he had the knowledge and intent to commit the offense of escape.

Following a recess, the court stated

> And for the record, during the recess, I did go over the [recording] and listen to testimony, including the testimony by Officer – sorry – Carter with respect to her conversations with the father on the phone when she received the proximity tamper and strap tamper alerts.
> And I've also reconsidered my ruling with respect to the defense's motion regarding motion to strike the Officer's – the last officer, Dunkley's responses to the series of questions I asked after counsel – [defense] had finished her cross-examination. And so I am going to strike the responses to the questions from the Court that followed after [defense] concluded her cross-examination that preceded [the State] when I asked if the State had any follow-up questions, she said no, because the Court had asked basically some of the follow-up questions that she intended to ask.
> So I did not consider – frankly, I didn't consider much of Officer Dunkley's testimony with the exception of what she testified to with respect to the contract, her recognition of the contract, the fact that she believes she went over the contract in summary form not word by word with both the respondent and parents and she believes all parties signed that.
> So beyond that, though, I did not consider her testimony.

The court made several findings of fact including the following:

- "The main question before this Court was whether the Respondent knew his actions would result from leaving custody."

- "This Court only considered Mr. Spencer's testimony for purposes of demonstrating that the Respondent has had prior contact with members of ASD and has previously been told prior to going on EHM, and again in December of 2021, of the expectations and conditions while on EHM."

- "When the Respondent's father arrived at the location he was directed to, he described what he observed to be the ankle bracelet/tracker that was supposed to be on the Respondent's. He found it amongst the bushes."

- "The Respondent's father confirmed he found the bracelet, that it was cut and that he had the bracelet in his hands as he was speaking to Officer Carter."

- "Officer Dunkley didn't recall the specific conversation with the Respondent, but she did confirm that she went over the contract in accordance with her training and experience and that she didn't deviate from the official protocol. Per protocol, which she admits does not require the reading of the entire contract with the individuals, she focused on the key points of the contract."

- "Officer Dunkley described that one of those key points is to remind the monitored individual and the parent(s)/guardian(s) that cutting off of the bracelet could result in being placed on escape status."

- "The Court recalls that Officer Spencer was perhaps the only one who testified specifically that he tells each youth the expectations and contractual conditions - that they effectively are on what he describes as 'house arrest' and that they are still in custody. . . . The Court finds that there was no testimony from Officer Dunkley or Officer Carter that they engage in the same kind of descriptive conversation with individuals. However, the Court find [sic] that State's Exhibit 6 [the EHM contract] speaks for itself."

- "Officer Carter, Officer Spencer, and Officer Dunkley all went over the expectations and conditions of the EHM contract, including what the penalties would be if the Respondent cut off the ankle bracelet."

The court found D.L.W. guilty. D.L.W. appeals.

## DISCUSSION

D.L.W. contends he is entitled to a new trial because the judge violated his due process right to a fair trial. D.L.W. asserts that in addition to asking numerous questions of witnesses, the judge "elicited testimony to prove necessary elements where the prosecutor did not" and "actively helped the prosecutor admit exhibits into evidence where the prosecutor could not," which "demonstrates the trial court improperly took on the role of the prosecution."

As a threshold matter, the State contends that D.L.W. failed to preserve a claim of due process error at trial. D.L.W. argues in reply that we should take review because the trial court's failure to act as a neutral arbiter implicates his constitutional guarantee

of a fair trial and is such a manifest error that it affected this constitutional right. We agree with D.L.W.

Under RAP 2.5(a) this court may refuse review of "any claim of error which was not raised in the trial court." However, a "manifest error affecting a constitutional right" may be raised for the first time on appeal. RAP 2.5(a)(3). The right to a fair trial is a fundamental liberty right with constitutional protections. State v. Moreno, 147 Wn.2d 500, 507, 58 P.3d 265 (2002)). Both the Fourteenth Amendment to the U.S. Constitution and article I, section 3 of the Washington Constitution offer protection against deprivation of liberty without due process of law. "A fair trial in a fair tribunal is a basic requirement of due process." In re Murchison, 349 U.S. 133, 136, 75 S. Ct. 623, 99 L. Ed. 942 (1955). The due process right to a fair trial is implicated where the court crosses the line from neutral arbiter to advocate. Moreno, 147 Wn.2d at 509-11. "[A] judicial proceeding is valid only if" it has an appearance of impartiality, such that "a reasonably prudent and disinterested observer would conclude that all parties obtained a fair, impartial, and neutral hearing." State v. Bilal, 77 Wn. App. 720, 722, 893 P.2d 674 (1995) (quoting State v. Ladenburg, 67 Wn. App. 749, 754–55, 840 P.2d 228 (1992), abrogated on other grounds by State v. Finch, 137 Wn.2d 792, 809-09, 975 P.2d 967 (1999)). "[I]t may be unfair to a litigant for a judge to don executive and judicial hats at the same time." Moreno, 147 Wn.2d at 507.

> A fair trial in a fair tribunal is a basic requirement of due process. . . . "[E]very procedure which would offer a possible temptation to the average man as a judge [to forget the burden of proof required to convict the defendant, or which might lead him] not to hold the balance nice, clear and true between the State and the accused, denies the latter due process of law." Tumey v. Ohio, 273 U.S. 510, 532[, 47 S. Ct. 437, 71 L. Ed. 749 (1927)]. Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the

18

> scales of justice equally between contending parties. But to perform its
> high function in the best way "justice must satisfy the appearance of
> justice." <u>Offutt v. United States</u>, 348 U.S. 11, 14[, 75 S. Ct. 11, 99 L. Ed.
> 11 (1954)].

<u>Id.</u> at 507 (alterations in original) (quoting <u>Murchison</u>, 349 U.S. at 136).

Under RAP 2.5(a)(3), D.L.W. must show "'actual prejudice.'" <u>State v. Kalebaugh</u>, 183 Wn.2d 578, 584, 355 P.3d 253 (2015) (quoting <u>State v. O'Hara</u>, 167 Wn.2d 91, 99, 217 P.3d 756 (2009)). Actual prejudice is "'a plausible showing . . . that the asserted error had practical and identifiable consequences in the trial of the case.'" <u>Kalebaugh</u>, 183 Wn.2d at 584 (quoting <u>O'Hara</u>, 167 Wn.2d at 99).

D.L.W. contends that without the "court's intervention, the government may not have been able to satisfy the foundational requirements for the documents it sought to have entered into evidence." Spencer testified that he did not have "specific recall" of the actual conversation he had with D.L.W. prior to D.L.W. being placed on EHM in 2021. It was through the court's questioning that it was established that D.L.W. "has had prior contact with members of [Alternative to Secure Detention] and has previously been told prior to going on EHM, and again in December of 2021, of the expectations and conditions while on EHM." The court interjected to question Graves when the court could not understand the State's attempts at establishing that the crime occurred in the state of Washington. The court again jumped in to voir dire another witness, Carter, to help lay the foundation to admit Exhibit 2. Also, even after the State believed it had laid the proper foundation to allow Carter to testify as to what D.L.W.'s father told Carter, the court apparently was not satisfied and again elicited testimony from Carter that then was followed by the court's ruling to allow the testimony under the present sense impression exception to hearsay. Though the court found Exhibit 6 "speaks for itself,"

19

the court elicited testimony from Dunkley in response to defense foundation objections before admitting the exhibit.

The asserted error had practical and identifiable consequences in the trial of this case. The State nevertheless contends that the court did not err because it was merely clarifying witnesses' testimony.

"Trial judges have wide discretion to manage their courtrooms and conduct trials fairly, expeditiously, and impartially . . . We, therefore, review a trial judge's courtroom management decisions for abuse of discretion." In re Marriage of Zigler and Sidwell, 154 Wn. App. 803, 815, 226 P.3d 202 (2010) (citation omitted).

> [A] trial judge's discretion to participate in the examination of a witness, although broad, is not unlimited:
>
> *It is entirely proper for [a judge] to participate in the examination of witnesses for the purpose of clarifying the evidence, confining counsel to evidentiary rulings, controlling the orderly presentation of the evidence, and preventing undue repetition of testimony.*
>
> A trial judge's participation may, however, overstep the bounds of propriety and deprive the parties of a fair trial. This court will order a new trial, however, only if the record discloses actual bias on the part of the trial judge or leaves the reviewing court with an abiding impression that the judge's remarks and questioning of witnesses projected to the jury an appearance of advocacy or partiality.

United States v. Morgan, 376 F.3d 1002, 1008 (9th Cir. 2004) (second alteration in original) (quoting United States v. Mostella, 802 F.2d 358, 361 (9th Cir. 1986)). Courts are given the authority to "interrogate witnesses, whether called by [the court] or by a party; provided, however, that in trials before a jury, the court's questioning must be cautiously guarded so as not to constitute a comment on the evidence." ER 614(b). Judicial comment on the evidence "is naturally less of a concern in the context of a bench trial." Pierce v. Bill & Melinda Gates Found., 15 Wn. App. 2d 419, 444, 475 P.3d

1011 (2020). This is so because when the facts in a case are "passed upon by the trial judge alone, [the judge] may be presumed to have disregarded all improper and incompetent evidence." Whiting v. City of Seattle, 144 Wash. 668, 675, 258 P. 824 (1927). "In a bench trial, there is even a more 'liberal practice in the admission of evidence' on the theory that the court will disregard inadmissible matters." State v. Melton, 63 Wn. App. 63, 68, 817 P.2d 413 (1991) (quoting State v. Jenkins, 53 Wn. App. 228, 231, 766 P.2d 499 (1989)). We therefore begin with a "presumption in favor of the trial judge" as our guiding principle when examining whether a judge's questioning was fair in a bench trial. Pierce, 15 Wn. App. 2d at 444.

While judges in a bench trial have "much broader discretion" to question witnesses, it would still "probably be error for the judge to take charge of a party's case or to become a clear partisan." 5A KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 614.5, at 618 (6th ed. 2016). "A trial court should not enter into the 'fray of combat' or assume the role of counsel." Ra, 144 Wn. App. at 705 (quoting Egede-Nissen, 93 Wn.2d at 141).

> In determining whether interjections and questions violate the due process right to a fair trial, we consider the proceedings as a whole and examine a number of factors, including the frequency and nature of the court's questions, whether the court waited until after counsel questioned the witness, whether the court's questions were clarifying or adversarial, whether the court interjected *sua sponte* in favor of one party, whether the questioning was impassioned or accusatory, and whether the court usurped counsel's role.

State v. Pillon, 11 Wn. App. 2d 949, 981, 459 P.3d 339 (2020) (citing Moreno, 147 Wn.2d at 507-12; United States v. Pena-Garcia, 505 F.2d 964, 967 (9th Cir. 1974); United States v. Saenz, 134 F.3d 697, 702-05 (5th Cir. 1998); United States v. Singer, 710 F.2d 431, 436-37 (8th Cir. 1983); United States v. Van Dyke, 14 F.3d 415, 418-20

(8th Cir. 1994)).

D.L.W. argues that the trial judge took on the prosecutor's role and intervened on the State's behalf when the prosecutor "had trouble entering an exhibit into evidence or establishing whether D.L.W. knew that his acts were an escape." D.L.W. points out that the trial judge extensively examined the government's witnesses after the defense counsel stopped their cross-examination and before the State was given an opportunity to redirect. D.L.W. also notes where "the court . . . intervene[d] before the defense counsel even got a chance to cross-examine the witness."

D.L.W. is correct that the trial court overstepped its bounds and took on the role of the prosecution. D.L.W. avers that this case is analogous to Matter of Dependency of B.W.K., an unpublished opinion where a bench trial for a parental rights termination was found to have manifest constitutional error where the trial court interjected "more than 800 times," challenged the credibility of the mother and elicited evidence not presented by the parties. No. 76675-9-I, slip op. at 1 (Wash. Ct. App. Oct. 29, 2018) (unpublished), https://www.courts.wa.gov/opinions/pdf/766759.pdf, aff'd, In re Dependency of B.K., 449 P.3d 1054 (2019).[2] This court held that "the cumulative effect of the court's interjections and questions in this case constitutes manifest constitutional error and denied the mother the due process right to a fair trial." Id. slip op. at 1. The B.W.K. court reiterated that the judge in a bench trial still has "broad discretion" to "question witnesses and control the proceedings," but held that "the timing and nature of the questions" showed that the trial court had "crossed the line between neutral arbiter

---

[2] Unpublished opinions of the Court of Appeals have no precedential value and are not binding, though, as B.W.K. was filed after March 1, 2013, it may be cited where properly identified in brief and is accorded such persuasive value as this court finds appropriate. GR 14.1(a).

and advocate." <u>Id.</u> slip op. at 1, 6.

In the instant case, the trial judge's interjections repeatedly were not just clarifying questions, they were a series of questions specifically intended to elicit testimony to lay the foundation to admit an exhibit or testimony in response to defense objections. The court often jumped in without giving the State an opportunity to respond to the objection or redirect the witness.

For example, the prosecution's first witness, Spencer, was a community placement specialist introduced by the prosecution to testify both as to the electronic ankle bracelets used for D.L.W.'s home monitoring and Spencer's own prior involvement in D.L.W.'s case. On cross-examination the defense asked Spencer if he remembered signing a home-monitoring contract in September of 2021 with the defendant and a guardian. Spencer replied that he did not have specific recall of doing so. After the defense ceased their questions, and before redirect by the State, the judge interjected with a lengthy series of questions. The court's questioning elicited testimony from Spencer that he recognized D.L.W. and had worked with him over a year and a half, and recalled speaking to D.L.W. and telling him what would happen if he cut off his bracelet. The State had focused its questioning of Spencer as it related to going over the EHM contract with D.L.W., but Spencer later testified that he had no specific recall of D.L.W. signing the EHM contract.

On another occasion, the State's attempt to establish that the crime occurred in the State of Washington through the testimony of Graves confused the court and eventually lead to the court taking over by saying, "let me voir dire the witness." The court then proceeded to ask a series of questions to establish that Graves was a

23

corrections sergeant with the King County Jail, and thus there was no reasonable ground to believe that Graves would be involved with home detention electronic monitoring of an individual from another county or state.

The next witness, Carter, was questioned by the prosecution on direct in order to develop the foundation to introduce an EHM monitoring alert document, Exhibit 2, under the business records exception. The defense moved to cross-examine the witness to voir dire the witness and test the foundation of the documentary evidence. After the defense finished, the court immediately stated "Let me voir dire the witness" and asked questions to establish the foundation to introduce the contested evidence. After finishing, the court asked "Counsel, what's your argument?" After further argument the State asserted that the proper foundation had been laid and defense still objected. Instead of simply ruling on the objection, the court again intervened by directly asking the witness follow-up questions until stating "I'm satisfied that there's sufficient indicia of reliability under RCW 5.45.020, which is the business records as evidence . . . So State's Exhibit No. 2 will be admitted."

While it is "entirely proper" for judges to "participate in the examination of witnesses for the purpose of clarifying the evidence, confining counsel to evidentiary rulings, controlling the orderly presentation of the evidence, and preventing undue repetition of testimony," Mostella, 802 F.2d at 361, they must be careful not to assume a role of advocacy in place of the prosecution. Moreno, 147 Wn.2d at 509. It was the State's job of introducing and laying the foundation to establish the admissibility of its evidence and prove its case. However, the court relieved the State of its burden by *sua sponte* eliciting testimony from witnesses in response to objections from defense.

24

Dunkley, a community surveillance officer (CSO), was called to testify in order to establish the foundation for the introduction of the EHM contract relevant to the charged offense. Dunkley did not remember being present for the signing of the EHM contract by D.L.W and his guardian. Thus, Dunkley was not able to testify that she remembered D.L.W. or his parent signing the contract but was able to recognize her own signature: "My signature is on it, so I think I did. It looks like I did." After defense objection, the court responded not by issuing a ruling or allowing the State to redirect. Instead, the court asked Dunkley a series of questions, including a leading question: "And is it your usual practice to witness the signatures even though you don't have a specific recollection of this particular incident?" Dunkley answered, "Yeah, I would have to have been there with them. If I signed it, they would have to sign it while I'm there." The judge then stated that he was allowing the testimony and the prosecutor returned to questions about the contract before successfully moving to admit the contract into evidence.

This was not just an isolated occurrence. The court's successful redirect of the State's witnesses may have been proper had it been done by the prosecutor. But it was improper for the judge to have assumed the prosecutor's role under the circumstances. See United States v. Hickman, 592 F.2d 931, 935-36 (6th Cir. 1979) (reversing and remanding for a new trial where a district judge improperly conducted redirect examination of a witness and constantly interrupted, which frustrated the defense at every turn and infringed upon defendants' rights of cross-examination). The court interjected with each of the State's four witnesses to assist in eliciting testimony it then relied on to both admit evidence over defense objections and adjudicate a finding of

guilty. The cumulative effect of these multiple interjections caused the court to cross the line from being a neutral arbiter to advocate.

Because the court violated D.L.W.'s due process right to a fair trial, we reverse the order on disposition and remand for a new trial before a different judge.

_____ Coburn, J.

WE CONCUR:

_____ Smith, C.J.

_____ Mann, J.